The Dolite Company v. Commissioner.
Dolite Co. v. Commissioner
Docket No. 11811.
United States Tax Court
1948 Tax Ct. Memo LEXIS 88; 7 T.C.M. (CCH) 672; T.C.M. (RIA) 48184; September 23, 1948
*88 John J. Kendrick, Esq., 700 Home Bank Bldg., Toledo, Ohio, and G. Charles Scharfy, Esq., for the petitioner. Howard M. Kohn, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion This proceeding involves deficiencies in petitioner's income tax, declared value excess-profits tax, and excess profits tax for 1941, 1942, and 1943, as follows: Declared Value
Excess-
Excess
Year
Income Tax
Profits Tax
Profits Tax
1941
$5,818.96
$10,229.17
1942
704.85
$190.98
29,741.52
1943
27,692.53
$6,523.81
$190.98
$67,663.22
Several of the issues raised in the petition have been settled by stipulation, which will be given effect under Rule 50 computation. The only remaining issue involves the question of reasonable compensation for two of the petitioner's officers in each of the taxable years. Findings of Fact The petitioner is an Ohio corporation, with its principal place of business at Toledo, Ohio. Its returns for the years involved were filed with the collector of internal revenue for the tenth district of Ohio. Since its organization in 1936 the petitioner has been engaged continuously in the business *89 of manufacturing and selling roasted refractory dolomite. This is a limestone product, blended with iron and other ingredients, which is used principally by steel manufacturers as a refractory for repairing the linings of their furnaces. Normally, the manufacture of a ton of steel requires the use of about 35 pounds of refractory dolomite. Although several other concerns in the United States manufacture dolomite, petitioner is the only exclusive manufacturer. Under the manufacturing process employed by the petitioner, crushed limestone and other ingredients are fed into a rotary kiln and calcined at a temperature of over 2800 degrees. The petitioner's organizers were Joseph J. Schedel, its president and general manager, and Samuel L. Rice, its vice president. Schedel furnished the technical skill and Rice arranged for financing the business. There was an original paid-in capital of $50,000, which was increased in 1938 to $150,000, and in 1939 to $200,000. The petitioner's original capital stock, consisting of 500 shares, was issued 50 per cent to Schedel, 30 per cent to Rice, and 20 per cent to O. S. Slosser. Slosser served as secretary and treasurer of the company until 1938 when *90 he was succeeded by Charles Schuster. The persons named comprise the petitioner's board of directors, Schuster succeeding Slosser in that capacity also. During the taxable years here involved there were 2,000 shares of stock outstanding, of which Schedel owned 1,400 and Rice 600. Schedel received his technical education in Germany. From 1921 to 1929 he served as designing engineer for the Stephens-Adamson Manufacturing Company at Aurora, Illinois. In this capacity he developed designs for various types of equipment for handling cement, colored stone, gravel, and other heavy materials. In 1927 he designed a complete new limestone crushing and screening plant for Herzog Limestone Company at Forest, Ohio. In 1930 to 1934 he was employed as engineer by the Kelly Island Lime and Transport Company at Cleveland, Ohio, the largest producer of limestone products in this country. After terminating his services with the Kelly Island Lime and Transport Company, Schedel spent approximately fourteen months investigating the possibility of organizing a company to manufacture roasted refractory dolomite exclusively. He made exhaustive geographical studies and tests of the limestone deposits in *91 the northwestern section of Ohio in order to determine the best location for such plant. He also located enough available used equipment to start operations and made a preliminary design of the proposed plant. Lacking sufficient funds of his own his next step was to arrange the necessary financing for the business. The necessary financial backing was obtained through Samuel L. Rice, who had substantial banking and business connections. The construction of petitioner's plant was begun at Gibsonburg, Ohio, soon after petitioner's organization. The petitioner began operations about May 1936. Schedel has served as its president and general manager continuously since that time. He has devoted all of his working time to the business. He and Rice and Schuster have comprised the board of directors since 1938, when Schuster became connected with the business. Schedel personally designed and supervised the construction of petitioner's plant and the installation of its equipment. The plant contained many labor-saving features and was recognized by the industry as a model plant. It consisted of stone-crushing apparatus, a large rotary kiln, with a capacity of approximately 32,000 tons per *92 annum, various buildings and sheds, conveyor systems, railroad track, locomotive cranes, and other equipment. In 1938 a second larger rotary kiln was installed, and the capacity of the plant more than doubled. Schedel hired and trained the employees, supervised all plant operations, purchased supplies, sold all of the output, and generally, managed the business. The petitioner uses electric motors to power its machinery. Prior to 1940 current for these motors was purchased from a public utility. In that year the petitioner installed a Diesel power plant to furnish its current. This resulted in a saving of approximately $12,000 a year in operation costs. Schedel designed the power plant, selected all equipment and supervised its installation. From time to time Schedel made other plant improvements which resulted in considerable savings to the petitioner in labor and other costs, such as devices for drying stone, feeding the kilns uniformly, and automatically controlling the electrical equipment. All of the various engineering services required by the petitioner in the organization and operation of its business have been performed by Schedel without any outside assistance. In *93 1938 the petitioner employed a salesman to assist Schedel who up to that time had handled all of the petitioner's sales. Petitioner's total selling expenses in the taxable years 1941, 1942, and 1943, including the salary of the salesman, amounted to $10,222.41, $14,349.19, and $13,628.24, respectively. The petitioner's production and sales increased from 31,462.02 tons in 1937, the first full year of its operation, to 72,473.08 tons in 1942. Its gross profits increased from $78,741.28 in 1937 to $203,928.94 in 1942, and its net profits, per books, from $3,387.51 to $37,690.65. Petitioner's net income, as adjusted by respondent, but without any adjustment for officers' salaries, amounted to $62,360.83 in 1941, $43,893.66 in 1942, and $34,069.97 in 1943. Petitioner's total assets, as shown by its balance sheets, increased from $121,458.53 in 1936 to $409,032.38 in 1943. Over the same period its net worth increased from approximately $50,000 to over $332,000. The petitioner paid dividends of $1,625 in 1936, $3,000 in 1937, $6,000 in 1938, $1,500 in 1939, and $2,000 in each of the years 1940 to 1943, inclusive. During the years 1936 to 1943, inclusive, the petitioner paid compensation *94 to the three above-named officers, as follows: Year
Joseph J. Schedel
Samuel L. Rice
O. S. Slosser
Charlesschuster
1936
$15,289.48
$6,000.00
$4,000.00
1937
19,461.60
8,100.00
5,400.00
1938
21,290.02
9,000.00
2,700.00
$ 1,880.00
1939
21,913.07
9,000.00
3,930.00
1940
46,000.00
9,000.00
14,700.00
1941
46,000.00
9,000.00
14,700.00
1942
46,000.00
9,000.00
15,040.00
1943
46,000.00
9,000.00
15,040.00
The respondent, in his notice of deficiency, disallowed in each of the taxable years $26,000 of the compensation paid to Schedel and $3,000 of that paid to Rice. He made no adjustment with respect to Schuster's salary. Schedel received his compensation from the petitioner in the dual capacity of president and general manager. He received a straight salary as president and a salary and bonus, based on earnings, as general manager. His total compensation as president was $25,000 for each of the taxable years 1941, 1942, and 1943, and as general manager $21,000. His salary as president was voted and paid him from year to year. The salary and bonus as general manager was first authorized by a contract between him and the *95 petitioner, dated January 17, 1936. This contract was superseded by a new contract entered into in 1938, which was amended in 1940. Under the 1936 contract Schedel received as general manager a base salary of $3,600, plus a "percentage of the base salary * * * directly proportionate to the percentage of profits." To illustrate, if the petitioner's profits amounted to 10 per cent over and above costs, the bonus was 10 per cent of the base salary. Under the 1938 contract the base salary remained the same, but the bonus was to be computed on a percentage of the base salary double the company's percentage of earnings. Under the 1940 amendment, the base salary was increased to $15,000 per year, but the bonus was to be computed on the old base salary of $3,600. As so computed, Schedel's salary and bonus as general manager would have exceeded the $21,000 actually paid to him in each of the taxable years, but he gratuitously waived such excess. The compensation paid to Schedel by the petitioner in each of the taxable years was reasonable compensation for the services performed by him. Samuel L. Rice has served as vice president of petitioner since its organization. He has also served as *96 an officer or director, or both, of many other organizations. From some of these organizations he has received compensation several times greater than that paid to him by the petitioner. His services to the petitioner have consisted principally of supervising its finances. He frequently conferred with Schedel about the petitioner's financial affairs. During the earlier years he made arrangements for petitioner's bank loans and endorsed its notes. During the years 1936 to 1940, inclusive, the petitioner obtained some twenty-eight bank loans, aggegating approximately $200,000. Most of such loans were for short terms and in amounts of not over $5,000. By 1941 the petitioner had a sound credit rating of its own and was able to arrange its own financing. Opinion LEMIRE, Judge: The evidence is convincing, as we have found above, that the $46,000 of compensation which the petitioner paid to Schedel in each of the taxable years involved was not excessive. The petitioner owed its success almost entirely to the industry, technical skill, and genius of Schedel. In the beginning he gave up well-paid employment to spend approximately fourteen months, without any remuneration, preparing the *97 ground work for petitioner's organization. He performed the services of geologist, mechanical engineer, business manager and plant superintendent. He is widely recognized as an outstanding authority in his field. Under his management and guidance the petitioner quickly gained a leading position in the industry. In view of the many and varied services which Schedel performed for the petitioner, the value of those services in terms of returning profits, and the advantageous position in which they placed the petitioner in the industry, seem fully to establish the reasonableness of the compensation paid to him. The fact that this compensation was paid in part for his services as president and in part for his services as general manager is of no particular concern to us here. The question is whether the total amount paid to him was reasonable compensation for his services. As to Samuel L. Rice, the evidence is inconclusive. Nowhere in the record is there any clear showing of just what services he performed for the petitioner during the taxable years involved. Such general statements as that he supervised the petitioner's finances, to which the evidence is limited for the most part, *98 do not meet the issue. It is not shown what part of his working time, if any, Rice regularly devoted to the petitioner's business or that he did anything more during the taxable years than to confer with Schedel from time to time on matters of finance and general progress. He had no definite services to perform for the petitioner and devoted no regular hours to its affairs. From the list of his other activities there is a reasonable inference that a substantial portion of his working time was taken up with the affairs of other concerns. The respondent's determination that $6,000 for Rice was reasonable compensation for the services actually performed by him is sustained for lack of evidence as to error in such determination. Decision will be entered under Rule 50.